

Opinions of the United
States Court of Appeals
for the Third Circuit

9-8-2005

# L. v. Dept Pub Welfare PA

Precedential or Non-Precedential: Precedential

Docket No. 04-3859

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"L. v. Dept Pub Welfare PA" (2005). *2005 Decisions.* Paper 487.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/487

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 04-3859
_____

FREDERICK L.; NINA S.;
KEVIN C.; STEVEN F., on Behalf
of Themselves and all Persons
Similarly Situated,

Appellants

v.

DEPARTMENT OF PUBLIC WELFARE
OF THE COMMONWEALTH OF PENNSYLVANIA;
*ESTELLE B. RICHMAN, in her official
capacity as Secretary of Public Welfare
for the Commonwealth of Pennsylvania

*(Substituted Pursuant to Rule FRAP 43(c))
_____

Appeal from the United States District Court
For the Eastern District of Pennsylvania
D.C. No.: 00-cv-04510
District Judge: Honorable Berle M. Schiller
_____

Argued: July 12, 2005

Before: SLOVITER, McKEE, and ROSENN, <u>Circuit Judges</u>

(Filed:   September 8, 2005)

Mark J. Murphy (Argued)
Robert W. Meek
Disabilities Law Project
1315 Walnut Street, Suite 400
Philadelphia, PA 19107

        Counsel for Appellants

Claudia M. Tesoro (Argued)
Office of Attorney General of Pennsylvania
21 South 12th Street, 3rd Floor
Philadelphia, PA 19107

        Counsel for Appellees
        _____

OPINION OF THE COURT
        _____

<u>ROSENN</u>, Circuit Judge.

This class action appeal is unique in that both parties have the same objective:  the timely discharge of long-term

mental health patients[1] from the Norristown State Hospital ("NSH"), a mental heath facility located in southeast Pennsylvania. The parties diverge, however, over the time frame for discharge, the number of patients to be discharged, and the perceived fiscal restraints hindering discharge.

Appellants ("Patients") are a class of mental health patients institutionalized at NSH who are statutorily eligible for deinstitutionalization and who therefore seek integration into community-based healthcare programs. Patients claim that because they are qualified and prepared for community-based services, their continued institutionalization violates the anti-discrimination and integration mandates of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq.[2] and 28 C.F.R. § 35.130(d) (1998),[3] and section 504 of

---

[1]For purposes of these proceedings, long-term mental health patients are those confined to Norristown State Hospital for more than two years.

[2]42 U.S.C. § 12132 provides in relevant part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

[3]28 C.F.R. § 35.130(d) provides: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."

the Rehabilitation Act, 29 U.S.C. § 794[4] and 28 C.F.R. § 41.51(d) (1998).[5] Appellee is the Pennsylvania Department of Public Welfare ("DPW"),[6] the entity charged with the responsibility and duty to provide statewide mental health care. See 62 PA. STAT. ANN. § 1101.

In its first consideration of this case, the District Court ruled in favor of DPW, holding that under Olmstead v. L.C., 527 U.S. 581 (1999), the integration accommodation patients requested was unavailable at the time because it would require a "fundamental alteration" of Pennsylvania's mental health program in light of its limited economic resources and its obligations to other segments of the mentally disabled

---

[4]29 U.S.C. § 794 provides in relevant part: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service."

[5]28 C.F.R. § 41.51(d) provides: "Recipients shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons."

[6]Estelle B. Richman is also listed as an appellee in her official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania. For simplicity, we refer to appellees collectively as "DPW."

4

population.  Frederick L. v. Dep't of Pub. Welfare, 217 F. Supp. 2d 581, 594 (E.D. Pa. 2002) ("Frederick L. I").[7]

This court vacated and remanded for further evaluation of whether there was sufficient evidence to justify acceptance of Pennsylvania's "fundamental alteration" defense. Frederick L. v. Dep't of Pub. Welfare, 364 F.3d 487, 501 (3d Cir. 2004) ("Frederick L. II").  We based this determination largely upon DPW's failure to heed the Supreme Court's admonition in Olmstead that a state may avoid liability by providing "'a comprehensive, effectively working plan for placing qualified persons with mental disabilities'" in community-based programs with "'a waiting list that moved at a reasonable pace.'"  Id. at 494 (quoting Olmstead, 527 U.S. at 605–606).  Accordingly, we directed the District Court on remand to instruct DPW to devise a plan which would demonstrate a commitment to community placement "in a manner for which it can be held accountable by the courts."  Id. at 500.

DPW offered post-remand submissions which the District Court credited as proof of the required commitment to

---

[7]In addition to its responsibilities for the care, maintenance, and treatment of the mentally ill in state institutions, DPW also has similar responsibilities for the mentally retarded.  50 PA. STAT. ANN. § 4201.  It also provides for public assistance to the poor and needy of the state, assistance to the blind, and operates institutions for juvenile delinquents.  See Public Welfare Code, 62 PA. STAT. ANN. § 101 et seq..

deinstitutionalization. The Court, therefore, ruled in favor of DPW on remand. Patients have now appealed again. We vacate the Court's judgment in favor of DPW and remand for further proceedings not inconsistent with this opinion.

I.

The background of this case has been adequately set forth in the cases leading up to this appeal. See Frederick L. I, 217 F. Supp. 2d 581; Frederick L. II, 364 F.3d 487. Thus, we dispense with a factual recitation and proceed directly to the legal issues for discussion. We review the District Court's conclusions of law de novo and its factual conclusions for clear error. Goldstein v. Johnson & Johnson, 251 F.3d 433, 441 (3d Cir. 2001). In this appeal, Patients challenge DPW's compliance with this Court's mandate in Frederick II that it develop a plan for future deinstitutionalization of qualified disabled persons that commits it to action in a manner for which it can be held accountable by the courts. Frederick II, 364 F.3d at 500.

In their current brief to this Court, Patients argue that in our previous decision remanding to the District Court, we held that DPW could not meet its burden to prove its fundamental alteration defense with proof of its fiscal constraints because if every alteration requiring an outlay of funds were tantamount to a fundamental alteration, the ADA's integration mandate would indeed ring hollow. Patients also argue that in our previous decision we did not accept as sufficient proof DPW's past efforts toward deinstitutionalization and its good faith intention to further

6

deinstitutionalize as quickly as possible given its fiscal constraints. Frederick L. II, 364 F.3d at 499. They similarly argue that we saw as insufficient to establish a fundamental alteration defense DPW's review of county and regional budget requests related to deinstitutionalization efforts and its individualized discharge planning for NSH residents.

Patients recognize that in delineating the balance between their interests in discharge to appropriate community placements and DPW's fiscal and programmatic constraints, this Court was informed by the Olmstead plurality's suggestion that the state could establish a fundamental alteration defense by demonstrating that it had a comprehensive, effectively working plan "to discharge persons who are unnecessarily institutionalized in more integrated settings" and "a waiting list that moved at a reasonable pace." Frederick II, 364 F.3d at 494, 498. Patients complain that against this backdrop, the plan submitted to the District Court by DPW fails to provide concrete, measurable benchmarks and a reasonable timeline for them to ascertain when, if ever, they will be discharged to appropriate community services. Patients contend that such benchmarks and timelines are essential to comply with this Court's mandate.

On the other hand, DPW argues that our previous mandate expressed the issue as whether DPW had "given assurance" that it will make "ongoing progress toward community placement," thereby satisfying the "fundamental alteration" defense. Frederick II, 364 F.3d at 500. In its current brief, DPW emphasizes its past success in moving

7

institutionalized patients into community settings and describes the various mechanisms for doing so, including the Community/Hospital Integration Projects Program ("CHIPP"). DPW also discusses its policy of deinstitutionalizing eligible patients and its various planning efforts aimed at devising strategies to accomplish that goal, including designation of a Service Area Planning ("SAP") group for each of the nine state-operated psychiatric hospitals, each charged with developing plans to achieve three specific goals within five years. DPW admits that it does not intend to implement these plans as written, but it argues that "[t]here is no legal basis for plaintiffs' contention that, without concrete 'benchmarks' and 'timelines,' DPW's planning efforts are inadequate."

DPW argues that all it was required to do on remand was to demonstrate "a commitment to take all reasonable steps to continue [its past] progress." Frederick II, 364 F.3d at 500. DPW argues that the District Court correctly found that it had satisfied our instruction that it submit a plan on remand for which it could be held accountable, Frederick II, 364 F.3d at 500, because "a court cannot become enmeshed in minutiae. Nor, if the state is heading in the right direction, can a court dictate a certain approach to the development and delivery of mental health services." DPW further argues that, contrary to Patients' contentions, the lack of benchmarks, timelines, commitments to implement any of the SAP plans, and specific relief for class members in its post-remand submission, are not fatal to its fundamental alteration defense because "there is no one 'right' approach to Olmstead planning." DPW argues that "hard numbers cannot be the

8

*sine qua* non of an acceptable plan" and that concrete and measurable guidelines are not sufficient to make a plan to provide community residential services legally acceptable.

DPW also argues that Patients' criticism of its lack of commitment to implement the SAP plans as written is misplaced because the SAP plans are merely tools in a larger state-wide planning process that requires it to assess needs and allocate scarce resources. DPW points out that the January, 2005 announcement of the closing of Harrisburg State Hospital actually exceeds the goals set forth in the SAP plan for that region. It also argues that is has no special duty to class members as opposed to the rest of the patients in its care; that it was not required on remand to demonstrate any specific plans with respect to the class; and that to favor class members over other persons in its care would violate Olmstead.

Because DPW apparently refuses to accept verifiable benchmarks or timelines as necessary elements of an acceptable plan, much of its brief misses the mark. Although we are aware of DPW's strong commitment in the past to deinstitutionalization (viz., Pennsylvania's mental health hospital population has declined from 40,000 in the 1950's to fewer than 3,000 at the time of trial), DPW's post-remand submission amounts to a vague assurance of the individual patient's future deinstitutionalization rather than some measurable goals for community integration for which DPW may be held accountable.

As we noted in Frederick L. II, this case is governed by

Olmstead. Frederick L. II, 364 F.3d at 492. Olmstead requires that patients eligible and desirous of community placement be discharged into community-based programs if placement can be reasonably accommodated,[8] taking into account the resources of the state and the needs of other persons in its care. Olmstead, 527 U.S. at 587. Pennsylvania's Mental Health and Mental Retardation Act of 1966 ("MH/MR Act" or "Act"), 50 PA. STAT. ANN. § 4101 et seq., identifies the county as the responsible entity for providing community-based mental heath services.[9] DPW is

---

[8]A reasonable accommodation may be a "reasonable modification to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services." 42 U.S.C. § 12131(2).

[9]50 PA. STAT. ANN. § 4301 provides in relevant part:

(a)     The local authorities of each county separately or in concert with another county or counties . . . shall establish a county mental health and mental retardation program for the prevention of mental disability, and for the diagnosis, care, treatment, rehabilitation and detention of the mentally disabled and shall have power to make appropriations for such purposes.
                              * * *
(d)     [I]t shall be the duty of local authorities in cooperation with the department to insure that the following mental health and mental retardation services are available:
                              * * *

obligated by both federal and state law to integrate eligible patients into local community-based settings.

However, the integration mandate "is not boundless." Olmstead, 527 U.S. at 603. As the Supreme Court noted in Olmstead, the integration imperative is qualified by the "fundamental alteration" defense, under which integration may be excused if it would result in a "fundamental alteration" of the state's mental health system, for example, one that would cause the state to disregard or neglect the needs of other institutionalized patients. See id. at 604. The Supreme Court also noted that a state may defend against integration claims by providing "a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated." Id. at 605–606.

We interpret the Supreme Court's opinion to mean that a comprehensive working plan is a necessary component of a successful "fundamental alteration" defense in these proceedings. Thus, although we uphold the District Court's factual conclusion that accelerating community placements would constrain the state's ability to satisfy the needs of other institutionalized patients, DPW may not avail itself of the "fundamental alteration" defense to relieve its obligation to

_____

(6) Aftercare services for persons released from State and County facilities.

11

deinstitutionalize eligible patients without establishing a plan that adequately demonstrates a reasonably specific and measurable commitment to deinstitutionalization for which DPW may be held accountable. Although DPW attempted to construct such a plan, we are not persuaded that its efforts have been sufficient.

The cornerstone of DPW's deinstitutionalization plan is the Community/Hospital Integration Projects Program ("CHIPP"). CHIPP was designed by DPW to reorient "the focus of mental health services away from reliance on large [mental health] institutions to community based treatment." Despite this commendable goal, however, CHIPP appears to have missed its mark. Although the initial CHIPP draft plan contained measurable goals, including plans to "[c]ontinue downsizing state hospital census at minimum 250 beds annually," as well as closing "all civil beds in at least three state psychiatric hospitals," the plan that DPW eventually disseminated abandoned the target closures. The final plan substituted the more amorphous, i.e., non-specific, goal of closing "up to 250 CHIPP beds a year."

In addition, although the CHIPP plan directed the county/regional planning offices to submit five-year plans to effectuate DPW's deinstitutionalization goals, DPW inexplicably failed to implement any plan for the first designated  year.

Finally, DPW requested that each of the state's nine regions served by a state psychiatric hospital submit a formal written plan, called a "Service Area Plan" ("SAP"), for

12

implementing the 2002 CHIPP plan.[10]  Despite receiving all nine SAPs, however, DPW's post-remand submissions lacked any commitment to implement the SAPs in whole or part. Nor did DPW commit to use the regional SAPs to develop a coordinated statewide plan that accounted for the needs of Patients as well as those otherwise institutionalized.

In attempting to defend the CHIPP plan against charges of being ineffectual, the Deputy Secretary of DPW's Office of Mental Health and Substance Abuse Service ("OMHSAS") declared in his post-remand submission that CHIPP "was never intended to be the 'last word' on what OMHSAS planned to do from that date forward in terms of serving Pennsylvanians with mental illness.  It was, however, a step that formalized the larger planning and service-delivery process, and it set forth a framework for future steps." However, that is precisely the infirmity with DPW's proposed plan for deinstitutionalization, namely its failure to set forth reasonably specific and measurable targets for community placement.

---

[10]Each SAP was to assess the needs of its regional target population to reach three goals within five years:  (a) attaining a maximum term of institutionalization of two years for all patients; (b) limiting a patient's involuntary commitment to twice in one year; (c) reduction of the incarceration rate for the target population, with the intent to provide treatment in lieu of jail for those mental patients who have run afoul of the criminal laws.

DPW's post-remand submissions promised the District Court that "[t]here will be no reversal of the Department's proven commitment to deinstitutionalization throughout our state hospital system." However, DPW has failed to demonstrate in reasonably measurable terms how it will comply with this commitment. In Frederick L. II we explained that "[o]ne of our principal concerns is the absence of anything that can fairly be considered a plan for the future." Frederick L. II, 364 F.3d at 500. Yet DPW remains silent as to when, if ever, eligible patients at NSH can expect to be discharged. Instead, DPW proffers general assurances and good faith intentions to effectuate deinstitutionalization. General assurances and good-faith intentions neither meet the federal laws nor a patient's expectations. Their implementation may change with each administration or Secretary of Welfare, regardless of how genuine; they are simply insufficient guarantors in light of the hardship daily inflicted upon patients through unnecessary and indefinite institutionalization. Thus, notwithstanding any announced commitment to deinstitutionalization, DPW's failure to articulate this commitment in the form of an adequately specific comprehensive plan for placing eligible patients in community-based programs by a target date places the "fundamental alteration defense" beyond its reach.

II.

Many years before the enactment of the ADA, Pennsylvania adopted an enlightened program for the mentally ill and mentally retarded. Under the leadership of Governor William W. Scranton, it passed Pennsylvania's

14

Mental Health and Mental Retardation Act of 1966. That legislation set the stage for the deinstitutionalization, whenever possible, of mental health patients and the mentally retarded. The Act created a delicate and venturesome balance between the counties and local communities on the one hand and the State on the other. It also fashioned a difficult but important role for the DPW in managing the responsibilities of all the parties in meeting the aftercare and maintenance needs of the deinstitutionalized patients.

We recognize that the structure of the MH/MR Act poses difficult problems for the State in meeting specific numerical goals in placing eligible patients in community-based programs. Although DPW has broad supervisory duties over county authorities and the State provides 90% of the funding, county authorities are the entities charged with responsibility for aftercare services. This includes community-based services for individuals discharged from state hospitals. 50 PA. STAT. ANN. § 4301(d)(6) ("[I]t shall be the duty of local authorities in cooperation with [DPW] to insure [the availability of] [a]ftercare services for persons released from State and County facilities."); see also In re Wayne K, 382 A.2d 989, 991 (Pa. Cmmw. Ct. 1978). In carrying out these responsibilities, counties are not mere agents of DPW; rather, the State and counties are partners, each with separate responsibilities. "The State, through [DPW], is responsible for the overall supervision and control of the program to assure the availability of and equitable provision for adequate mental health and mental retardation facilities, and the counties, separately or in concert, are assigned responsibilities as to the particular programs."

15

Hoolick v. Retreat State Hosp., 354 A.2d 609, 611 (Pa. Cmmw. Ct. 1976).

Along with DPW's supervisory responsibilities, the MH/MR Act charges it with the power and duty "to make . . . and enforce all regulations necessary and appropriate to the proper accomplishment of the . . . duties and functions imposed by this act." 50 PA. STAT. ANN. § 4201(2). The State and the counties are also required by statute to consult with each other and to cooperate. See 50 PA. STAT. ANN. §§ 4201(3), 4301(d). To this end, DPW reviews each county's annual plan for providing mental health services and makes grants to the counties on the basis of those plans. In cases where sufficient funds are not available to DPW to pay the full amount of all county budget requests, DPW has the duty "to distribute State funds among the counties by a formula reasonably designed to achieve the objectives of [the MH/MR Act]." 50 PA. STAT. ANN. § 4509(5). If DPW does not fund, or does not fully fund, a county program, the county is "required to provide only those services for which sufficient funds are available." Id. In addition, counties may request one-year waivers from DPW for relief from their obligations to provide statutorily mandated services under certain circumstances, for example, when they are unable, or it would be economically unsound, to provide the services. 50 PA. STAT. ANN. § 4508(a).

The administration of such a program, involving the participation of not only the State, State funding, and participation by the counties, including fund allocation, is not only difficult to manage, but equally difficult to create. Yet,

16

DPW is the entity finally charged with ensuring that the State and counties comply with their duties. The MH/MR Act requires DPW to "assure . . . the availability and equitable provision of adequate . . . services," 50 PA. STAT. ANN. § 4201(1), and "to consult with and assist each county in carrying out . . . duties and functions imposed by this act," 50 PA. STAT. ANN. § 4201(3). Therefore, we can see no other appropriate alternative but to require DPW to ensure that the State and the counties comply with the mandates of the MH/MR Act and the applicable federal laws.

III.

DPW's inability to invoke the "fundamental alteration" defense leaves unfulfilled its responsibility to provide Patients with their requested relief. Having reached this conclusion, it may be helpful to the District Court if we offer some guidelines to it in evaluating DPW's plan for deinstitutionalization of its patients at NSH.

In attempting to address the deinstitutionalization process, there are financial and medical constraints that burden DPW and inhibit its ability readily to set forth measurable goals for deinstitutionalization. Furthermore, we acknowledge that the judiciary is ill-suited to second guess DPW's expertise in devising a regimen of community placement. Ideally, complicated issues such as these are confided to the entity legislatively charged with oversight. However, where, as here, the equally compelling concerns of discrimination and Patients' rights are in tension with state agency planning, objective judicial guidance may be helpful.

17

The lengthy procedural history of this case reveals that we would be promoting confusion rather than clarity if we were to remand without providing DPW some specifics that are critically important to a comprehensive, effectively working plan. To alleviate the concerns articulated in Olmstead, we believe that a viable integration plan at a bare minimum should specify the time-frame or target date for patient discharge, the approximate number of patients to be discharged each time period, the eligibility for discharge, and a general description of the collaboration required between the local authorities and the housing, transportation, care, and education agencies to effectuate integration into the community.

## IV.

Accordingly, the District Court's judgment will be vacated and the case remanded to the District Court for proceedings consistent with this opinion. Each side to bear its own costs.