Franklin BENJAMIN, Richard Grogg, Frank Edgett, Sylvia Baldwin, Anthony Beard, and all others similarly situated, Plaintiffs,

v.

DEPARTMENT OF PUBLIC WELFARE OF the Commonwealth of PENNSYLVANIA and Harriet Dichter, in her official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania, Defendants.

No. 09–cv–1182.

United States District Court,
M.D. Pennsylvania.

Jan. 27, 2011.

Mark J. Murphy, Robert W. Meek, Disability Rights Network of PA, Stephen F. Gold, Philadelphia, PA, for Plaintiffs.

Allen C. Warshaw, Howard Ulan, Office of General Counsel, Harrisburg, PA, Marina Mazor, Samantha K. Trepel, United States Department of Justice, Washington, DC, for Defendants.

### MEMORANDUM & ORDER

JOHN E. JONES III, District Judge.

## I. INTRODUCTION

This is a class action, asserted by Franklin Benjamin[1], Richard Grogg[2], Frank Edgett[3], Sylvia Baldwin[4], and Anthony Beard[5] on behalf of all persons who: (1) currently or in the future will reside in on of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement. (*See* Doc. 9, Amended Complaint; Doc. 17, Order Certifying Class.) Plaintiffs assert that the Department of Public Welfare of the Commonwealth of Pennsylvania ("DPW") and Harriet Dichter, the Secretary of DPW[6] (collectively, "Defendants"), have failed to provide appropriate community services in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12134 ("Title II"), and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794 ("Section 504"). Plaintiffs seek declaratory and injunctive relief.

Presently before the Court are two motions for summary judgment. Plaintiffs filed their Motion for Summary Judgment ("Plaintiffs' Motion") on June 23, 2010 (Doc. 48) and Defendants filed their Motion for Summary Judgment ("Defendants' Motion") on June 29, 2010 (Doc. 51). Both Motions have been fully briefed, including an amicus brief filed by the United States in support of Plaintiffs' Motion (*see* Doc. 62), and thus each is ripe for disposition. The parties agree that there is no material factual dispute in this action and each asks the Court to answer one legal question—whether DPW has violated Title II and Section 504 by failing to provide Plaintiffs with community support and services. Because one common question predominates, we will resolve both Motions in this Memorandum. For the reasons that follow, we hold that Defendants have not complied with the integration mandates of the relevant statutes. An appropriate Order shall enter after our analysis.

## II. PROCEDURAL HISTORY

Plaintiffs filed the Complaint in this action on June 22, 2009 (Doc. 1) and an

---

1. .By and through his next friend, Andree Yock.

2. By and through his next friend, Joyce McCarthy.

3. By and through his next friend, Joyce McCarthy.

4. By and through her next friend, Shirl Meyers.

5. By and through his next friend, Nicole Turman.

6. The action was originally filed against Estelle Richman, as Secretary of DPW. Ms. Dichter since replaced Ms. Richman, but resigned on September 15, 2010. Michael Nardone is now acting Secretary.

Amended Complaint on July 14, 2009 (Doc. 9). Plaintiffs filed an unopposed Motion to Certify the Class on August 31, 2009, and the Court granted the Motion on September 2, 2009 and certified the above-named class. (Doc. 17.) On January 25, 2010, the Court denied Defendants' Motion to Dismiss (Doc. 38), and Defendants then filed their Answer to the Amended Complaint on February 24, 2010 (Doc. 39). In the meantime, a group of individuals filed a Motion to Intervene pursuant to Federal Rule of Civil Procedure 24, asserting that they had interests in the litigation that were not adequately represented by the class. (See Doc. 27.) The Court denied that Motion on March 10, 2010, 267 F.R.D. 456 (Doc. 41), and the proposed intervenors filed their notice of appeal of that decision on March 30, 2010 (Doc. 42).

As noted above, Plaintiffs filed their Motion for Summary Judgment on June 23, 2010 (Doc. 48) and Defendants filed their Motion for Summary Judgment on June 29, 2010 (Doc. 51). We referred the action to Magistrate Judge Martin Carlson for settlement discussions on October 6, 2010, but those discussions have thus far been unsuccessful. Though the parties have not foreclosed the possibility of further settlement negotiations, we believe the most prudent course is to resolve the motions that have been pending for months and to thereafter grant the opportunity to the parties to settle on the ultimate remedy themselves prior to additional and possibly unnecessary mandates by the Court.

## III. FACTUAL BACKGROUND

DPW is responsible for providing services to Pennsylvanians with mental retardation under the Mental Health and Mental Retardation Act of 1966, 50 P.S. § 4201(1). One of the means by which DPW provides services to individuals with mental retardation is through the operation of five state Intermediate Care Facilities for Persons with Mental Retardation ("ICFs/MR").[7] The services provided at these facilities are covered by Medical Assistance, and, thus, DPW receives a federal government funding match for their costs. The five state ICFs/MR housed a total of 1,272 individuals in 2008 and 1,224 individuals in 2009. In the five fiscal years between 2004 and 2009, fifty-four residents were discharged to community-based services, and two-hundred residents died. The anticipated census reduction in 2009–2010 is expected to be attributable almost exclusively to deaths rather than discharges. The average cost to provide services in the state ICFs/MR is approximately $240,000 per resident per year, and is expected to increase to approximately $256,000 per resident per year in the following fiscal year. In addition to the state-run ICFs/MR, DPW also funds privately-operated ICFs/MR that service approximately 2,500 persons with mental retardation.

DPW also funds community-based mental retardation services in addition to the state-operated or -funded institutions. These residential services can include small group homes, family living, vocational training, supported employment, development of skills, socialization, therapies, home health-care, and other support services. The services are funded primarily through Medical Assistance through a waiver system, of which the federal government pays a portion of costs. Though there is a limit to the number of persons

---

7. These facilities are the Ebensburg Center, located in Cambria County, the Hamburg Center, located in Berks County, the Polk Center, located in Venango County, the Selinsgrove Center, located in Snyder County, and the White Haven Center, located in Luzerne County.

who can receive services under these programs, the federal government can grant permission to increase that limit and has readily done so in the past.

Plaintiff Benjamin has been institutionalized at the Ebensburg ICF/MR since 1966. Plaintiffs Grogg and Edgett have been institutionalized at the Selinsgrove ICF/MR for twenty (20) years each. Plaintiff Baldwin has been institutionalized at the Polk ICF/MR since 1990. Plaintiff Beard has been institutionalized at the Ebensburg ICF/MR for forty-two (42) years. All named Plaintiffs' mental retardation limits one or more of their major life activities but, with proper support, they could reasonably live in the community.

With appropriate community services, all of the named Plaintiffs could live in more integrated community settings rather than institutions because they would still have available all services and supports that are currently available to them. Further, pursuant to the principle of "normalization" that the Commonwealth of Pennsylvania has embraced[8], individuals with disabilities do significantly better if they have the opportunity to live in a "normal" environment, such as the environment available when receiving community-based services. Though the environment in which institutionalized individuals live may be "normal" in the sense that it is all they have known for the better part of their lives, the individuals are more segregated because:

> most state ICFs/MR are in more rural parts of the state; most state ICF/MR residents live in units ranging from about 16 to 20 people; day services are

usually provided on the grounds of the facilities; and residents do not have as much opportunity to interact with a wide range of people and to have access to community activities.

(Doc. 50, "Plaintiffs' Statement of Material Facts", ¶ 52.) The named Plaintiffs and others, and their appropriate guardians or family members, are unopposed to discharge to the community and some have been actively, albeit unsuccessfully, seeking such an opportunity.

Individuals are selected for community-based services via a waiting list that is divided into three categories. This categorization is determined by filling out a "Prioritization of Urgency for Need of Services" ("PUNS") form for each person applying for services. Those who need services immediately are designated as "emergency", those who will need services within two years are included on the waiting list as "critical", and those who will need services within two to five years are designated as "planning". Individuals are placed in the emergency waiting list if "community supports are needed to keep him/her from being placed in a state center, nursing home, large ICF/MR or other congregate settings." (Doc. 50 ¶ 79.) As of the filing of Plaintiffs' Motion, only 113 state ICF/MR residents had PUNS forms completed to put them on a waiting list.

Placement on a waiting list for community services does not, however, guarantee prompt placement in those programs. Indeed, no state ICF/MR residents in the past ten years have been discharged to the community as a result of these routine vacancies.[9] Each year, there are around

---

8. "This chapter [regarding community homes for individuals with mental retardation] is based on the principle of normalization which defines the right of the individual with mental retardation to live a life which is as close as

possible in all aspects to the life which any member of the community might choose...." 55 Pa.Code § 6400.1.

9. Fifty-four residents have been discharged since fiscal year 2004–2005; thirty-six of

700–750 vacancies for these services, and DPW instructs its agents to consider only those individuals who are on or meet the criteria for the emergency waiting list to fill the vacancies. When this litigation commenced, DPW had not formulated an integration plan (discussed below) that set benchmarks for the eventual discharge of institutionalized persons; but, on June 18, 2010, DPW apparently formulated such a plan ("the Plan"). (*See* Doc. 52 ¶ 37; Doc. 51–7.)

## IV. DISCUSSION

Plaintiffs assert that, because they are qualified for and unopposed to community integration, their continued institutionalization violates the antidiscrimination mandates of the ADA and Section 504. Plaintiffs argue that, because DPW has failed to provide services in the most integrated setting warranted and has failed to implement any plan to do so, the Court should grant their Motion for Summary Judgment and issue appropriate declaratory and injunctive relief to remedy those failures. In response, and in support of their Motion for Summary Judgment, Defendants admit Plaintiffs' pleadings to an extent, but counter that they have established the affirmative defense that the relief Plaintiffs seek would require a fundamental alteration of DPW's services and also deprive other individuals in need of important services. Defendants maintain that the eleventh-hour plan adopted in June of 2010 defeats Plaintiffs' claims regarding the absence of a viable integration plan, and argues that summary judgment should be granted in Defendants' favor because the Plan satisfies the requirements of the integration mandates.

those residents were discharged as a result of special funding intended to close a former

### A. Legal Framework of the Integration Mandate

#### 1. The ADA and the RA

In enacting the ADA, Congress made several important findings applicable to that statute. Relevant for these purposes, Congress asserted that "physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society", 42 U.S.C. § 12101(a)(1), and further found that:

(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

(3) discrimination against individuals with disabilities persists in such critical areas as ... institutionalization ...;

. . . .

(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, ... failure to make modifications to existing facilities and practices....

42 U.S.C. § 12101(a)(2), (3), (5). Thus, Congress enacted the ADA to provide "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities", 42 U.S.C. § 12101(b)(1), and establish "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities", 42 U.S.C. 12101(b)(2). Congress set forth prohibitions regarding discrimination against persons with disabilities in employment (Title I), public services (Title II), and public

state ICF/MR.

accommodations provided by private entities (Title III).

This action concerns the ADA's prohibition against discrimination in public services in Title II. Title II provides: "Subject to the provisions of this subchapter, no qualified individual with a disability [10] shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity [11], or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Congress further provided that "The remedies, procedures, and rights set forth in [§ 505 of the RA] shall be the remedies, procedures, and rights this title provides to any person alleging discrimination on the basis of disability in violation of [§ 12132]."

Congress directed the Attorney General to promulgate regulations to fully implement the provisions of Title II. 42 U.S.C. § 12134. As instructed, the Attorney General issued "General prohibitions on discrimination", including the important "integration regulation" and "reasonable-modification regulation". *See Olmstead v. L.C.*, 527 U.S. 581, 592, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). The integration regulation mandates that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

### 2. *Olmstead v. L.C.*

The Supreme Court addressed the integration mandates and subsequent regulations of the ADA and RA in the seminal case of *Olmstead v. L.C.* In *Olmstead*, two residents of mental-health institutions alleged that the State of Georgia violated the ADA's integration mandate by unnecessarily institutionalizing them instead of placing them in community-based programs. A plurality of Justices construed the ADA's provisions and held that "[u]njustified isolation ... is properly regarded as discrimination based on disability." 527 U.S. 581, 597, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). The Court noted that the ADA's

> [r]ecognition that unjustified institutional isolation of persons with disabilities reflects two evident judgments. First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life.... Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment.

*Id.* at 600–01, 119 S.Ct. 2176. The Supreme Court further recognized that, although the states have a responsibility to provide community services, that responsibility "is not boundless"; but, rather, is limited by the ADA's "reasonable modification" and "fundamental alteration" provision. *Id.* at 603, 119 S.Ct. 2176. These provisions provide that a state need not make alterations that would require a fundamental alteration of the nature of the services provided or the program under

---

**10.** "Qualified individual with a disability" is defined as "an individual who, with or without reasonable modifications ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

**11.** "Public entity" means "any State or local government...." and any instrumentality of a State or local government. 42 U.S.C. § 12131(1)(A)-(B).

which they operate. The plurality explained the justification for these defenses as follows:

> Sensibly construed, the fundamental-alteration component of the reasonable-modifications regulation would allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities.

*Id.* at 604, 119 S.Ct. 2176. Ultimately, *Olmstead* identified three elements in an integration case: (1) that community placement is appropriate for the individual (as determined by the state's professionals); (2) that the individual does not oppose transfer to a more integrated setting; and (3) that a placement in a more integrated setting can be reasonably accommodated, "taking into account the resources available to the State and the needs of others with mental disabilities." *Id.* at 607, 119 S.Ct. 2176. If all three elements are present, the state is required to provide community-based services.

### 3. *Frederick L. v. DPW I and Frederick L. v. DPW II*

The United States Court of Appeal for the Third Circuit visited the confines of the fundamental-alteration defense with respect to fiscal considerations in *Frederick L. v. Department of Public Welfare,* 364 F.3d 487 (3d Cir.2004) ("*Frederick L. I*") and *Frederick L. v. Department of Public Welfare,* 422 F.3d 151 (3d Cir.2005) ("*Frederick L. II*"). In *Frederick L. I,* a class of individuals who were institutionalized in the Norristown State Hospital appealed the district court's judgment that found that DPW sufficiently established that accelerated community placement for the plaintiffs would require a fundamental alteration of DPW's services. The Third

Circuit noted that establishment of the fundamental alteration defense relies on several relevant factors, including "the state's ability to continue meeting the needs of other institutionalized mental health patients for whom community placement is not appropriate, whether the state has a waiting list for community placements, and whether the state has developed a comprehensive plan to move eligible patients into community care settings." *Frederick L. I,* 364 F.3d at 495; *see also* 28 C.F.R. § 42.511(c); 45 C.F.R. § 84.12(c). The Third Circuit rejected the appellants' contention that the district court solely focused on the cost-constraints of integration, and further noted that "the judiciary is not well-suited to superintend the internal budgetary decisions of DPW ..." *Id.* at 497–98. Nonetheless, the Court found that the district court erred in "accept[ing] the Commonwealth's reliance on past progress without requiring a commitment by it to take all reasonable steps to continue that progress...." *Id.* at 499. In vacating and remanding the decision, the Court articulated:

> After all, what is at issue is compliance with two federal statutes enacted to protect disabled persons.... [Of that group, institutionalized persons] are perhaps the most vulnerable. It is a gross injustice to keep these disabled persons in an institution notwithstanding the agreement of all relevant parties that they no longer require institutionalization. We must reflect on that more than a passing moment. It is not enough for DPW to give passing acknowledgment of that fact. It must be prepared to make a commitment to action in a manner for which it can be held accountable by the courts.

*Id.* at 500.

The action in *Frederick L. I* returned to the Third Circuit the following year.

Upon remand, the district court again ruled in favor of DPW, finding that DPW offered sufficient proof of a commitment to deinstitutionalization. On appeal, DPW argued that it fully satisfied the Third Circuit's requirements because it "had 'given assurance' that it will make 'ongoing progress toward community placement.'" *Frederick L. II*, 422 F.3d at 156. The Third Circuit interpreted *Olmstead* to require a comprehensive working plan as necessary to a fundamental alteration defense, and held that, although DPW attempted to construct a plan, its efforts were insufficient to establish that defense. Although DPW offered promises of its commitment to deinstitutionalization, it "failed to demonstrate in reasonably measurable terms how it will comply with that commitment" such as when eligible patients could expect discharge. *Id.* at 158. Good-faith intentions without more are insufficient, according to the Third Circuit, because "[t]heir implementation may change with each administration or Secretary of Welfare, regardless of how genuine...." *Id.* Because DPW's plan lacked sufficient benchmarks regarding deinstitutionalization, the Third Circuit again vacated and remanded the decision with specific guidance, noting that a "viable integration plan *at a bare minimum* should specify the time-frame or target date for patient discharge, the approximate number of patients to be discharged each time period, the eligibility of discharge, and a general description of the collaboration required [between authorities to effectuate the transition]." *Id.* at 160.

### B. The Motions for Summary Judgment

In this action, we are tasked with answering the same question that was at issue in *Frederick L. I* and *Frederick L. II,* and similar cases: Does Defendants' segregation of Plaintiffs in public institutions constitute discrimination under Title II and Section 504? There is no dispute that community placement would be appropriate for an individual with appropriate services and supports and that the individuals in this litigation are not opposed to such a placement. Indeed, the definition of the class itself satisfies the first two elements articulated in *Olmstead.* Further, the existence of community programs demonstrates that providing community support could be reasonably accommodated. The central inquiry for the Court to resolve, therefore, is whether Defendants have demonstrated a commitment to action such that granting Plaintiffs' requested relief would require a fundamental alteration of the services already provided by the Commonwealth.

Defendants assert that there is no violation of Title II and Section 504 because DPW now has an *Olmstead* plan. According to Defendants, DPW will seek funding to move at least 50 institutionalized persons into community placements per year, if DPW determines a placement is available. Defendants assert that the Plan identifies the process for prioritizing individuals for community placement and moving them "as money comes available", and provides for the development of programs to educate residents and their guardians about the benefits of community services. (Doc. 66 p. 11.) Defendants admit, however, that there are contingencies to these commitments: First, no individual who would not thrive in a community placement may be moved; and, second, the money reserved to move institutionalized individuals may be directed to other, non-institutionalized individuals if a deputy secretary determines that it is necessary. (*Id.* pp. 11–12; Doc. 51–7 p. 4.) Defendants argue that, because the Plan was only adopted on June 18, 2010, there is no "history of implementation", but, "DPW has a long his-

tory of moving people from State centers into community placements." In fact, Defendants note:

> From 1995 to 2009, the census at State ICFs/MR has decreased from 3164 to 1224. Today, fewer than 1200 individuals receive services in State centers. Since 2000, Defendants have closed four State ICFs/MR, and four MR units on the grounds of State hospitals. Thus, there is no reason to question DPW's commitment to action.

(Doc. 66 p. 13.) Noticeably missing from that recitation, however, is any indicator of *why* the census decreased, and no assurances that it was because of DPW's commitment to action rather than because of deaths or similar occurrences.

Defendants note that they will place no residents in the community until the new fiscal year beginning in July of 2011, and then "it would not be realistic to commit to seek money for more than 50 residential placements." (Doc. 66 p. 15.) Defendants highlight the Commonwealth of Pennsylvania's deficit and argue that DPW simply does not have the funds to transfer individuals from institutions, regardless of the eventual savings such community placements would eventually realize. Further, Defendants maintain that the limited universe of community placements must first be filled by those persons who have no services. Those individuals take priority over institutionalized persons because "[f]or at least the past 16 years, DPW has tried to avoid admitting new residents into the State centers." (Doc. 52 ¶ 20.) In sum, Defendants argument centers around the existence of the Plan that was adopted on June 18, 2010, and because DPW now has a written plan, it has "committed itself" to deinstitutionalization and, thus, satisfies the requirements of *Olmstead.* Beyond asserting their compliance with the integration mandates, Defendants also assert that Plaintiffs' request for deinstitutionalization itself violates the ADA and RA because, according to Defendants, it would require them to deny services to other individuals. (Doc. 66. p. 17.)

Plaintiffs and the United States as Amicus argue that Defendants' Plan, "hastily assembled at the eleventh hour", does not amount to an *Olmstead* plan that is sufficient to establish the fundamental alteration defense. In support of this argument, Plaintiffs argue that "(1) on its face, the Plan lacks even the minimal required components; (2) the Plan fails to demonstrate the requisite commitment to integration; and (3) Defendants have not implemented the Plan." (Doc. 61 p. 15.) First, Plaintiffs highlight that the Plan lacks any time frames or dates for discharge, and instead provides only a target starting date of July 2011. Further, Plaintiffs maintain that the Plan's vague declarations of a commitment to integration, without identifiable benchmarks, are insufficient to demonstrate a "tangible commitment to action toward deinstitutionalization for which they can be held accountable." (*Id.* p. 17.) Plaintiffs highlight that the Plan is "riddled with exceptions and loopholes." (*Id.* p. 18.) Finally, Plaintiffs note that DPW has failed to implement the Plan, and expresses no intention to do so until July of 2011, nearly a year after its adoption.

## C. Analysis

■ We note at the outset of our analysis that Plaintiffs filed their Motion before any awareness of DPW adopting the June 18, 2010 Plan upon which they rely to defeat liability. The existence of the Plan does not, however, automatically defeat liability because we do not read *Olmstead, Frederick L. I,* or *Frederick L. II,* or any of their progeny to stand for the proposition that a written document purporting a commitment to deinstitutionalization alone

satisfies the requirements of those cases. Further, voluntary cessation of an illegal practice does not render an action moot or automatically defeat liability for that practice, especially where there is a reasonable expectation where the violation may again occur or the cessation of the practice (here, the adoption of a stated practice) has *not* "completely and irrevocably eradicated the effects of the alleged violation." *See, e.g. DeJohn v. Temple Univ.,* 537 F.3d 301, 309–11 (3d Cir.2008) (quoting *Los Angeles County v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979)). Thus, we will consider the existence of the Plan and the terms of the Plan, along with other appropriate factors, to evaluate whether DPW has sufficiently demonstrated an affirmative commitment to integration. We ultimately find that it has not.

■■■ As the Third Circuit articulated in *Frederick L. II,* "[g]eneral assurances and good-faith intentions neither meet federal law nor a patient's expectations" without providing when, if ever, a patient can expect to be discharged. *Frederick L. II,* 422 F.3d at 158. Indeed, the possibility of placement is, based upon the plain terms of the Plan, quite remote. It is contingent upon the prioritization of non-institutionalized individuals, (based upon DPW's stated policy of, essentially, using institutionalization as a last resort), DPW's assessment of the availability of funding, and the broad authority to use the funds that are allegedly directed to integrate institutionalized persons to place those who are not presently institutionalized. On its face, the Plan gives DPW nearly unfettered discretion to disregard its terms—for each of the 50 individuals it purports to place each year, the deputy secretary could find, based upon unidentified prioritization procedures, that the requisite funds be directed to a non-institutionalized person. Clearly, those who are currently receiving no services should have the opportunity to acquire supports; but within the dictates of the law DPW cannot continue to ensure this by relegating institutionalized individuals to second-class status in order to avoid subjecting any new individual to the same segregation. We recognize that avoiding institutionalization is an important goal; however, it is not one that can be achieved by discriminating against individuals who have equal rights to community support.

Beyond the deficient commitment to action on the face of the Plan, the absence of implementation, or even any demonstrated step *toward* implementation, is insufficient for Defendants to assert a fundamental alteration defense. Defendants cite fiscal considerations for the lack of any demonstrable progress toward deinstitutionalization, and readily admit that no steps will be taken toward that goal until the new fiscal year. Even overlooking the numerous loopholes and contingencies of the Plan, there is nothing on the record that illustrates any sort of viability of the Plan. Defendants cannot avail themselves of a fundamental alteration defense to their continued violation of the ADA and RA by merely supplying a written document that alleges a future commitment. Considering the absence of concrete benchmarks for deinstitutionalization in the contingency-ridden Plan, no record of actual implementation of the Plan, and a history of unnecessary segregation of and discrimination against institutionalized persons, we cannot conclude that DPW has complied with or will comply with the integration mandates of the ADA and RA.

**V. CONCLUSION**

Based upon the undisputed facts, Plaintiffs have established that Defendants have violated the integration mandates of Section II of the ADA and Section 504 of the RA by unnecessarily institutionalizing Plaintiffs. Despite Defendants' protestations, Plaintiffs are not seeking any im-

permissible form of "queue-jumping" and demanding they receive services to the detriment of other individuals. Plaintiffs seek to be appropriately considered for community placement, rather than be relegated to a class of persons who receive the placements only after another class is entirely served. Therefore, the Court will grant Plaintiffs' Motion for Summary Judgment (Doc. 48) and deny Defendants' Motion for Summary Judgment (Doc. 51). We are not blind to the budgetary constraints that Pennsylvania faces, and we are certainly mindful that DPW has limited resources; however, DPW cannot continue its practice of unnecessarily segregating individuals based upon their status as institutionalized. With that said, the present posture of this case is such that we are in no position to issue an injunction given the need for extensive detail therein and eventual oversight for any such relief provided. We will, therefore, schedule a telephonic conference with the parties to address the need for further submissions and a possible hearing regarding the extent of injunctive relief.[12]

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1. Defendants' Motion for Summary Judgment (Doc. 51) is **DENIED;**

2. Plaintiffs' Motion for Summary Judgment (Doc. 48) is **GRANTED;**

  a. Judgment is entered in favor of Plaintiffs Franklin Benjamin, Richard Grogg, Frank Edgett, Sylvia Baldwin, Anthony Beard, and all others similarly situated;

  b. It is **DECLARED** that the Defendants are not in compliance with the integration mandates of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 with respect to the named Plaintiffs and all others similarly situated;

4. This action will remain open until determination of the proper remedy;

5. A telephonic conference call to address the procedure for determining the appropriate relief is scheduled for Monday, January 31, 2011 at 10:00 a.m.;

6. Counsel for Plaintiffs shall initiate the conference call. The Court's phone number is (717)221–3986; and

7. All counsel shall be prepared to proceed at the time of the said call.

12. We now encourage the parties, imbued with this mandate, to return to mediation to formulate a resolution that implements a realistic plan that fully complies with the ADA and RA.